UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

FREDA I. BARNES,             )
                            )
        Plaintiff,          )
                            )
    v.                      )    Case No. 1:10CV133 FRB
                            )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,         )
                            )
        Defendant.          )

## ORDER

This cause is before the Court on plaintiff Freda I. Barnes' appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On August 25, 2006, plaintiff Freda I. Barnes ("plaintiff") applied for Disability Insurance Benefits (also "DIB") pursuant to Title II and for Supplemental Security Income Benefits (also "SSI") pursuant to pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging disability beginning August 6, 2006. (Administrative Transcript ("Tr.") 107-17). Plaintiff's applications were initially denied, (Tr. 75-81), and she requested a hearing before an administrative law judge (also "ALJ") (Tr. 82), which was held on November 17, 2008. (Tr. 20-74). On April 17, 2009, the ALJ

-1-

issued his decision denying plaintiff's claims. (Tr. 10-19).
Plaintiff sought review of the ALJ's decision from defendant
Agency's Appeals Council which, on June 28, 2010, denied her
request for review. (Tr. 1-4). The ALJ's decision thus stands as
the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

During Plaintiff's administrative hearing, she responded
to questions from the ALJ and from her attorney. When questioned
by the ALJ, plaintiff testified that she was 51 years old, and
lived by herself in a mobile home in Ellington, Missouri. (Tr.
24). Plaintiff's son had driven her to the hearing, which was
approximately a two-hour drive, and they made no stops. (Tr. 25).
Plaintiff testified that she could drive, but drove only to the
store and back, not on long trips. (<u>Id.</u>)

She completed the seventh grade of school, and had no
education or training beyond that. (<u>Id.</u>) Her last date of
employment was "about two years ago" at a nursing home as an aide
and cook, where she had worked for nine years. (Tr. 25-26). She
stated that she left this job due to leg and back pain that was so
bad she had to quit. (Tr. 26). Before the nursing home, she
worked in home health for two years, and before that, she worked
odd jobs such as babysitting. (Tr. 26).

Plaintiff testified that she did not try to work any kind
of lighter work after leaving the nursing home because her doctor
had opined that she was disabled. (Tr. 30). The ALJ asked

plaintiff whether her doctor had given her some sort of limitation or restriction, and plaintiff testified that her doctor just took her off her work "because it was too hard for me to do with my back and my legs." (Tr. 31). The ALJ asked whether plaintiff tried to do something lighter than her past work, and plaintiff replied that she could not return to work without a notice from her doctor. (Id.) The ALJ asked if plaintiff had asked her doctor whether she could do different work, and plaintiff replied that he had said no due to her "heart condition or whatever he didn't want me to go up there and have a heart attack or whatever." (Id.)

Plaintiff testified that she had sought treatment for her back and legs, and had received pain pills. (Tr. 27). She stated that she had undergone cardiac testing (Id.) and took Nitroglycerin,[1] hypertension medication, aspirin, Cyclobenzaprine,[2] Lunesta,[3] medication for diarrhea, and Fluoxetine.[4] (Tr. 31-32).

---

[1]Nitroglycerin is used to prevent angina, or chest pain. It works by relaxing the blood vessels to the heart, thereby increasing the flow of blood and oxygen to the heart.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601086.html

[2]Cyclobenzaprine is a muscle relaxant used to relax muscles and relieve pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html

[3]Lunesta, or Eszopiclone, is used to treat insomnia (difficulty falling asleep or staying asleep).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009.html

[4]Fluoxetine, also called Prozac, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

She also took Gabapentin[5] for pain, and Requip[6] for nighttime restlessness in her legs. (Tr. 34-35). She stated that Requip helped her. (Tr. 35).

When asked how she spent her days, plaintiff testified that she rose at 5:00 or 5:30 a.m. when she was hurting, and 7:00 a.m. when she was not, and then sat around and rested and watched "mostly [her] soap operas" on television. (Tr. 27-28). Plaintiff stated that a home health aide came to her home. (Tr. 28). She stated that she had been on Medicaid for the past two to three years. (Id.) She owned a car. (Id.) On the occasions she left home, she went to get prescriptions filled, and to the grocery store and gas station. (Tr. 28-29). She sometimes visited her son, and he visited her. (Tr. 29). She worked crossword puzzles, and "every so often" read the newspaper. (Id.) She could lift a gallon of milk, one in each hand, but not for very long because it made her arms hurt. (Tr. 29-30). Plaintiff testified that she had trouble dressing, and specified that she had difficulty lifting her legs to put on her pants, and raising her arms to put on her shirt. (Tr. 30).

Plaintiff testified that there were no treatments that

---

[5]Gabapentin is used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html

[6]Requip, or Ropinirole, is used alone or with other medications to treat the symptoms of Parkinson's disease and Restless Legs Syndrome (a condition that causes discomfort in the legs and a strong urge to move the legs, especially at night and when sitting or lying down).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698013.html

any of her doctors had recommended that she was unable to undergo due to expense, distance, or insufficient coverage. (Id.)

Plaintiff testified that she had chest pain several times per day, and took Nitroglycerin each time. (Tr. 33). She stated that the maximum amount of Nitroglycerin she was permitted was three tablets, and had taken three once while in the hospital. (Id.) She had never undergone stents, balloon angioplasty, or any other such procedures. (Tr. 34).

Plaintiff testified that she could not walk very far due to leg pain and breathlessness, and that standing for "10, 15, 20 minutes" caused leg pain. (Tr. 36). She could sit for one hour or two before she needed to stand. (Id.) She testified that her main problems were her heart, back and legs. (Tr. 44).

Plaintiff then responded to questions from her attorney. She testified that she attended special education classes beginning in the second grade, and graduated each year she attended school. (Tr. 37-38). She stated that she had trouble learning and, when asked why she left school in the seventh grade, she stated "Well, it seemed like I wasn't really learning anything and I thought, well, I can learn more at home." (Tr. 38). After leaving school, she looked for work, which took about one or two years. (Tr. 39). She did odd jobs, and started working for the nursing home in 1994. (Tr. 40).

Plaintiff stated that, while working for the nursing home, she had trouble lifting because of her back. (Tr. 40). When asked by her attorney, plaintiff stated that her legs also bothered

her. (Id.) She did not attempt to work anywhere else after leaving this employment. (Id.) When asked by her attorney, plaintiff said she felt she was unable to do anything else. (Id.) Plaintiff stated that she had used the services of a home health care aide for the past two years, and that the aide helped her from 9:00 a.m. until noon, seven days per week. (Tr. 40-41). Plaintiff's home health aide did plaintiff's cooking, vacuuming, and sweeping, (Tr. 41), and helped her with her medications. (Tr. 43). Plaintiff testified that she very often went to the grocery store by herself. (Tr. 41). She stated that she could not stand to ride longer than the mile trip to the grocery store. (Tr. 42). She stated that she sometimes slipped and fell in the shower, and needed help getting out. (Id.)

Plaintiff testified that bending over hurt her lower back, and that she had had this difficulty "[f]or most years," and that there was no incident that caused this pain, but the pain had just become bad. (Tr. 43). She testified that, without pain medicine, she would rate her leg pain as a nine on a scale of one to ten, but that pain medicine helped. (Tr. 44). She stated that her pain was in her calves. (Tr. 45). When plaintiff's attorney asked her about her knees, ankles and feet, plaintiff testified that they bothered her, too. (Id.) Plaintiff testified that she experienced chest pain "[o]nce a day, whatever," that lasted 15 to 30 minutes. (Tr. 48). She later stated that she had chest pain several times per day, and that she did not always take Nitroglycerin, but sometimes put her hands against her chest, which

eased the pain.  (Tr. 48-49).

Plaintiff testified that her doctor had told her that her lower back was fragile, and that treatment would not help.  (Tr. 50).  She stated that her low back caused her pain nearly all day and night, and said that it often rose to the level of ten on a scale of one to ten.  (Id.)  She stated that she experienced daily headaches, and had, off and on, for around three years.  (Tr. 51-52).  She stated that her medications made her drowsy to the extent she needed to rest her eyes.  (Tr. 52).

Plaintiff testified that she read her local newspaper, which came out once per day.  (Tr. 49).  She testified that she did not spend very long periods of time reading it, and mostly just glanced through it and looked at the photographs.  (Tr. 49-50).

Plaintiff testified that she was assaulted two or three years ago, and visited the hospital.  (Tr. 53).  She testified that she experienced shaking in the back of her neck and hands, and that she had restless leg syndrome.  (Tr. 53-54).  She gets "charley horses" low in the calves of her legs once per week.  (Tr. 54).

Plaintiff then testified that she had been taking medication for depression for three or four years, and that her depression began following the death of her eighteen-year-old son in a car accident, and the death of her children's father.  (Tr. 55-56).  She stated that she experienced depression two or three times per week for a couple of hours, and took medicine.  (Tr. 57).  She testified that she became nauseous if overheated, and took medicine for nausea.  (Tr. 58-59).  She testified that she could

rotate her neck fully from side to side. (Tr. 59).[7] She testified
that her arm and leg became numb, and that the numbness lasted for
a few hours and went away with a little rubbing. (Tr. 59-60).
Approximately six months to one year ago, while sitting at a stop
sign, plaintiff had an episode she described as a blackout. (Tr.
60). She sometimes had ringing in her ears that lasted for about
an hour and went away on its own. (Tr. 61). Being in cold weather
made her hurt all over, which she described as all of her body
hurting when she got cold. (Id.) She rated this discomfort as an
eight on a scale of one to ten. (Tr. 62). Plaintiff sometimes
experienced chills that lasted for an hour, and experienced night
sweats fairly often. (Tr. 62-63).

Plaintiff then responded to more questions from the ALJ.
She testified that, once per week, she drank one or two beers to
relax. (Tr. 63). She stated that, about one or two years ago, she
drank more than this, but quit. (Tr. 63-64). She stated that she
had not been drinking a lot up until one or two years ago. (Tr.
64). The ALJ noted that hospital records indicated that plaintiff
had a blood alcohol reading of 3.50 in August of 2006, generally
considered a lethal amount in people who don't drink, and plaintiff
stated that she had cut down since then. (Id.) She has not
participated in any kind of alcohol treatment program. (Id.)
Plaintiff explained that her son talked to her, and that helped her

_____

[7]Plaintiff's testimony concerning her ability to lift her arms and legs
was unclear. Plaintiff's attorney asked, "Okay. How about your arms? How
high can you lift your arms? And how about your legs, different story?" to
which plaintiff responded, "yes." (Tr. 59).

-8-

cut down.  (Id.)  Plaintiff testified that her boyfriend visited a couple of times per week and brought her alcohol, and that her son brought her cigarettes.  (Tr. 64-65).  Plaintiff stated that she did not take any medicine to help her breathe.  (Tr. 65).

In response to questioning from her attorney, plaintiff stated that she had trouble with "alcoholism or drinking" for several years and that, when she went to the hospital with high alcohol levels, she was in very bad shape, but that her son talked to her about her grandchildren and this helped her moderate her drinking.  (Tr. 66).  She stated that she last drank alcohol last month, and stated that she was able to stop with one or two because she lost her taste for it.  (Tr. 66-67).

The ALJ then heard testimony from Gary Weemhold, a vocational expert ("VE").  The ALJ specified a hypothetical individual of plaintiff's age, education and work experience with the following abilities and limitations:  could lift 20 pounds on occasion and 10 pounds frequently, could stand and/or walk about six hours, and could sit for at least six hours, and who should avoid climbing ladders, ropes and scaffolds and working at unprotected dangerous heights and around unprotected dangerous machinery and the person should (out of an abundance of caution) avoid concentrated exposure to noxious fumes, odors, dusts and gases and also was limited to simple and/or repetitive work and should avoid concentrated exposure to cold.  (Tr. 69-70).  The VE testified that such a person could not perform plaintiff's past work, but could work as a motel or office cleaner, simple assembly

jobs such as assembler of small products, and packaging and inspection work, all of which existed in substantial numbers in the local and national economy. (Tr. 70). The ALJ then amended the hypothetical to the sedentary level, involving maximum lifting of ten pounds; maximum standing and/or walking of about two hours; and sitting for six hours, and the VE testified that other types of assembly and hand packaging would be available for such a person. (Tr. 71).

The VE testified that, if discretion with regard to sitting and standing were added, the packaging and assembly jobs at the light level would be reduced to 2500 in each category, and to 1200 in each category at the sedentary level. (Id.) The VE testified that consistently missing more than two days per month, month after month, would preclude competitive employment in these jobs. (Id.) The VE testified that, if a person could show up every day but at least once a week, every week, would either show up late or leave early, or have to step away from the work setting for at least the equivalent of an additional break per day, such activity would not result in loss of employment as long as work performance was otherwise good. (Tr. 71-72).

B.   Medical Records[8]

Records from Rodney T. Rubi, M.D., show that plaintiff was seen on January 22, 2004 with complaints of a raw, sore throat

---

[8]The following summary includes medical information dated before plaintiff's alleged onset date, and after the ALJ's decision. Plaintiff alleges no error based upon any of these records, including those submitted to and considered by the Appeals Council.

and cough off an on since October of 2003, and also for a pap smear. (Tr. 283). It was noted that she had no medical history. (Id.) It was noted that she smoked one and one-half packs of cigarettes daily. (Id.) Examination revealed no swelling in her extremities. (Id.) On October 26, 2004, plaintiff saw Dr. Rubi with complaints of to headache, cough, nausea, vomiting, and abdominal pain. (Tr. 280). She denied chest pain. (Id.) She reported smoking daily, and drinking almost daily. (Id.)

Records from Advanced Healthcare Medical Center ("Advanced Healthcare") show that plaintiff was seen in October of 2004 with complaints of upper quadrant pain. (Tr. 390). It was noted that plaintiff smelled of alcohol. (Id.)

Plaintiff returned to Dr. Rubi's office on March 9, 2005 and saw Philma Opinaldo, M.D., with complaints of coughing and sinus drainage and lower back pain and pain between her shoulders, but denied chest pain. (Tr. 279). She was tender over the thoracic and lumbar spine, with tight paraspinal muscles and decreased mobility, but no lower extremity swelling. (Id.) Plaintiff returned to Dr. Rubi's office with these complaints on June 29, 2005. (Tr. 278). On October 21, 2005, plaintiff returned and saw Judith A. Medley, R.N., with complaints of a rash. (Tr. 277).

On April 24, 2006, plaintiff saw Dr. Rubi with complaints of abdominal pain and dizziness. (Tr. 258). She complained of headache, and lower back pain and bilateral leg pain. (Id.) she denied chest pain and limping. (Id.) Following examination, Dr.

-11-

Rubi diagnosed plaintiff with a urinary tract infection and abdominal pain. (Tr. 260). On May 8, 2006, plaintiff saw Dr. Rubi, and denied headache, chest pain, or trouble walking. (Tr. 268). She stated that she felt better but still had heartburn and abdominal pain. (Id.) Plaintiff returned to Dr. Rubi on June 22, 2006 with complaints of pain in the right side. (Tr. 265). She denied neck pain, chest pain, limping, and she was noted on examination to be in no distress. (Tr. 265-66). She returned on July 3, 2006, stating she was no better, and denied neck pain, chest pain, limping, and denied feeling tired or poorly. (Tr. 263-64). On July 18, 2006, she reported having fallen on her way to her bed and injured her left shoulder, arm and wrist. (Tr. 260-61). She denied nausea and vomiting, headache, neck pain, chest pain, and limping, and denied feeling tired or poorly. (Tr. 261).

Records from Advanced Healthcare Medical Center indicate that plaintiff was seen in the emergency room on August 4, 2006 with complaints of chest pain and shortness of breath. (Tr. 301). It was also noted that plaintiff complained of night sweats and weight loss. (Id.) J. Michael Hoja, M.D., wrote on a prescription note pad that plaintiff had chest pain and required extensive testing and treatment, and was "disabled and unable to work" for one year. (Tr. 327). Chest x-ray performed on this date was normal, but it was noted that plaintiff's heart was within the upper limits of normal in size. (Tr. 310). It was noted that plaintiff spoke with slurred speech, and smelled of ethanol and tobacco. (Tr. 301). However, it was noted that plaintiff's

memory was intact, she was neat and clean, her verbalization was appropriate for the situation, and she was cooperative. (Id.) She was diagnosed with chest wall pain and acute alcohol intoxication. (Tr. 300).

Plaintiff returned to the emergency room at Advanced Healthcare on August 6, 2006 with complaints of chest pain and left shoulder pain. (Tr. 285-86). She spoke with coherent speech, and was alert and oriented times three. (Id.) Cardiovascular assessment was normal. (Tr. 287). Chest x-ray performed on this date revealed no definite acute cardiopulmonary process, and heart size was noted to be normal. (Tr. 299).

On September 8, 2006, plaintiff was seen at Advanced Healthcare with complaints of chest pain. (Tr. 371). She complained of episodic pain, and stress-induced insomnia. (Id.) Psychiatric evaluation was negative. (Id.) An appointment was made for a myocardial perfusion scan. (Id.)

On October 4, 2006, Medical Consultant P. Moran completed a Psychiatric Review Technique form. (Tr. 314-24). Consultant Moran found that plaintiff had no medically determinable impairment and assessed no limitations. (Id.) Consultant Moran found that plaintiff had multiple years' earnings of over $10,000.00 and had worked multiple years as a cook/dietary aide and as a homemaker for an independent living center; was able to shop and manage money; and had no problems with others. (Tr. 324). Consultant Moran noted that plaintiff's August 2006 mental status at the emergency room indicated that plaintiff was neat and clean with appropriate

-13-

behavior, an intact memory, and appropriate affect. (Id.)
Consultant Moran concluded that, based upon the totality of
findings in the file, there was no current psychological medically
determinable impairment, and no reason for continued exploration of
one. (Id.)

On October 5, 2006, DDS Examiner B. Huffman completed a
Case Analysis noting that plaintiff had alleged a heart condition
and lower abdominal pain; analyzed plaintiff's medical records from
April through August of 2006; and concluded that there was no
medically determinable impairment for either condition. (Tr. 325).

On November 9, 2006, plaintiff was seen at Advanced
Healthcare "to see if she can go back to work." (Tr. 370). She
complained of chest pain. (Id.) Also on this date, Dr. Hoja wrote
on a prescription form that plaintiff had chest pain and "may be
trying to have a heart attack" and required extensive heart tests
"done urgently." (Tr. 326). Dr. Hoja wrote that plaintiff was
"disabled and unable to work." (Id.)

On November 16, 2006, Dr. Hoja wrote a letter to the
Missouri Department of Social Services, stating that he was
plaintiff's family physician and believed that she required
extensive heart tests. (Tr. 333). Dr. Hoja wrote that he had
advised plaintiff to take a leave from her work due to her health
conditions, and stating that plaintiff did not have insurance or
any source of income to pay for the testing or for her monthly
medications. (Id.) He wrote that he believed that plaintiff was
completely medically disabled and unable to work for at least one

-14-

year, and needed financial help for her medications and temporary assistance due to her inability to work per his orders. (Id.) Dr. Hoja asked that plaintiff be considered for public assistance. (Id.)

On November 22, 2006, plaintiff was seen in the emergency room at Advanced Healthcare with complaints of shortness of breath, chest tightness, increased chest pain especially when coughing, and productive cough. (Tr. 486-87). She was evaluated by Tirso Aldana, M.D., who noted that plaintiff was alert and oriented and in no apparent respiratory or pain distress, but was coughing frequently and grabbing her chest while she coughed. (Tr. 487). Examination was normal, and she had no swelling. (Id.) EKG and chest x-ray were unremarkable. (Id.) Dr. Aldana diagnosed plaintiff with acute coronary artery syndrome,[9] and exacerbation of chronic obstructive pulmonary disease (also "COPD").[10] (Tr. 487-88). She was admitted for IV antibiotic therapy and nebulizer treatments. (Tr. 488).

On November 23, 2006, plaintiff was evaluated by Paul Rains, D.O., and stated that she did have some chest pain earlier, but denied current chest pain. (Tr. 489). Dr. Rains noted that plaintiff's vital signs were normal, and that plaintiff was in no distress. (Id.) Dr. Rains opined that plaintiff should continue

_____

[9]Coronary artery syndrome is caused by a buildup of plaque on the inner walls of the arteries that supply blood to the heart. http://www.nlm.nih.gov/medlineplus/coronaryarterydisease.html

[10]COPD causes difficulty with breathing. Coughing up mucus is often the first sign of COPD. Chronic bronchitis and emphysema are common COPDs. Cigarette smoking is the most common cause of COPD. http://www.nlm.nih.gov/medlineplus/copdchronicobstructivepulmonarydisease.html

her present care. (Id.) Plaintiff was discharged on November 24, 2006 with a diagnosis of acute coronary syndrome which had been ruled out for heart attack; atypical chest pain; COPD exacerbation, and bronchitis. (Tr. 490).

On December 7, 2006, plaintiff plaintiff was seen at Advanced Healthcare with complaints of recurring bronchitis and cough. (Tr. 369).

On December 30, 2006, plaintiff was seen at Advanced Healthcare with complaints of a large bruise in her left temporal area, difficulty swallowing and hoarseness, and reported that she had been assaulted by her boyfriend, and that he had struck the side of her head with a boot and a fist and had placed a boot on her throat to choke her, and plaintiff was very hoarse. (Tr. 386, 481). She had alcohol on her breath. (Id.) She had an intact memory and appropriate affect, and was conscious and cooperative. (Tr. 386). Testing was ordered. (Tr. 386, 481). X-rays of plaintiff's skull and facial bones were negative for fracture, and x-ray of plaintiff's neck revealed degenerative arthritis but an intact airway. (Tr. 482). A head CT revealed no evidence of hemorrhage. (Tr. 485).

On January 9, 2007, CT scan of plaintiff's abdomen and pelvis revealed prominences warranting follow-up CT scan to rule out cysts. (Tr. 480).

On January 12, 2007, chest x-ray revealed no evidence of acute cardiopulmonary process. (Tr. 479). On January 16, 2007, echocardiogram revealed an occasional irregular rate and rhythm,

with normal wall motion and no pericardial effusion. (Tr. 381).
A myocardial perfusion scan performed on this date revealed no
definite evidence of physiologically stress-induced ischemia. (Tr.
382).

On January 27, 2007, plaintiff was seen at Advanced
Healthcare for evaluation. (Tr. 334, 388). It was noted that she
smelled of alcohol. (Id.) She reported having suicidal thoughts
after a fight with her boyfriend. (Tr. 388). She was assessed
with alcohol intoxication, and it was noted that there was no
evidence of suicidal intent. (Tr. 334). She stated that she did
not try to kill herself. (Tr. 389). MRI of plaintiff's brain
performed on this date revealed multiple areas of abnormal
increased signal intensity on flare and T2 weighted images in the
deep white matter of both cerebral hemispheres. (Tr. 338).
Potential causes were thought to be non-active multiple sclerosis,
cerebrovascular disease, or a shearing injury,[11] among others.
(Id.) Plaintiff was also noted to have mild left ethmoid
sinusitis. (Id.) Diagnostic imaging of plaintiff's neck revealed
degenerative changes involving the spine. (Tr. 383).

On February 16, 2007 and March 16, 2007, she was seen at
Advanced Healthcare for checkup and medication refill. (Tr. 368).

On April 13, 2007, plaintiff was seen at Advanced

---

[11]The term "shearing injury" refers to traumatic brain injury that
occurs when tissue slides along other tissue. It is the sort of injury that
may result from a motor vehicle accident, fall, assault, sports injury, or
other form of blunt or penetrating head trauma. It can be mild, with symptoms
lasting a short duration and ending in full recovery, to severe, culminating
in death.
http://www.nlm.nih.gov/medlineplus/tutorials/traumaticbraininjury/htm/index.ht
m

Healthcare complaining that restless leg syndrome was keeping her awake at night, that she had trouble breathing while lying down, and that the Nitroglycerin patches were causing itching. (Tr. 366). April 20, 2007 x-rays of plaintiff's left hip and femur revealed mild degenerative arthritis involving the hip and knee. (Tr. 387). On June 1, 2007, she was seen at Advanced Healthcare for a checkup, and complained of two episodes of blacking out. (Tr. 365).

Plaintiff returned to Advanced Healthcare on June 29, 2007 with complaints of swelling and pain bilaterally in her feet, and trouble urinating. (Tr. 364). Abdominal x-rays revealed a non-obstructive bowel pattern and fecal retention and potential constipation. (Tr. 447-49).

An echocardiogram, performed on August 21, 2007, revealed mild mitral valve regurgitation. (Tr. 376). It was noted that there was normal wall motion and no pericardial effusion. (Id.) A CT scan of plaintiff's head, performed on this same date, was essentially unremarkable. (Tr. 441). An abdominal ultrasound performed on this date revealed no abnormal findings. (Tr. 442). A pelvic ultrasound performed on this date was essentially unremarkable. (Tr. 443). An echocardiogram performed on this date revealed mild mitral valve regurgitation. (Tr. 444).

A CT scan of plaintiff's abdomen and pelvis, performed on September 4, 2007, revealed degenerative arthritis involving the spine; and a probable fluid-filled loop of bowel; and arteriosclerotic plaque in the abdominal aorta. (Tr. 375).

On September 7, 2007, plaintiff was seen at Advanced Healthcare with complaints of right side pain. (Tr. 362). On October 4, 2007, she was seen for complaints of low back pain, and had decreased range of motion and tenderness referable to her low back. (Id.)

On November 21, 2007, Dr. Hoja completed a Medical Report Including Physician's Certification/Disability Evaluation form for the Missouri Department of Social Services, Family Support Division. (Tr. 328-29). Therein, Dr. Hoja indicated diagnoses of lumbar disc disease, depression, coronary artery disease, hypertension, and hypothyroidism, and checked a box indicating that plaintiff had a "mental and/or physical disability which prevents him/her from engaging in that employment or gainful activity for which his/her age, training, experience or education will fit him/her." (Tr. 329). Although solicited on the form, Dr. Hoja did not check the box indicating whether he had seen plaintiff in the past year, or provide a "brief clinical history." See (Tr. 328).

A CT scan of plaintiff's lumbar spine, performed on December 27, 2007, revealed mild diffuse bulging with associated osteophyte formation at the L5-S1 level; degenerative arthritis; and narrowing of the L5-S1 disc space. (Tr. 374).

On February 20, 2008, plaintiff underwent an echocardiogram at Advanced Health Care that revealed probable mild hypertrophy of the left ventricle. (Tr. 342). On February 28, 2008, in the Nuclear Medicine Department of Advanced Healthcare Diagnostic Services, plaintiff underwent a myocardial perfusion

-19-

scan that revealed no evidence of physiologically stress induced ischemia. (Tr. 341).

On March 11, 2008, plaintiff was seen by Elizabeth Bhargava, M.D., for psychiatric evaluation. (Tr. 339-40). Plaintiff stated that she presented for evaluation because her attorney sent her, and that she was applying for disability. (Tr. 339). She reported quitting her nursing home job three years ago due to heart problems. (<u>Id.</u>) She reported losing her son in a car accident five years ago, and had continuing grief. (<u>Id.</u>) She reported sleeping only three to four hours per night; being tired; and spending her day watching television. (<u>Id.</u>) Dr. Bhargava wrote that plaintiff's daughter-in-law came in and did her cooking and cleaning. (Tr. 339). She reported occasional panic attacks and feeling somewhat suicidal a month ago, when her boyfriend left her for someone else. (<u>Id.</u>) She reported enjoying playing with her grandchildren, but not much else. (<u>Id.</u>)

Dr. Bhargava noted that plaintiff had no prior hospitalizations or suicide attempts, and that Dr. Hoja had started her on Symbyax[12] for the past one year. (<u>Id.</u>) Plaintiff reported drinking more heavily after her son died, but cutting down to three cans of beer a couple of times per week. (Tr. 339). Plaintiff reported having four DWI's, with the last one occurring six to seven years ago, and participating in Missouri's Substance Abuse Traffic Offender Program ("SATOP"). (<u>Id.</u>) She denied using

---

[12]Symbyax is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html

recreational drugs or prescription drug use. (Id.)

Plaintiff denied any history of depression, but stated that there were multiple alcohol users in the family. (Tr. 340). Plaintiff reported "not having much of a childhood" indicating that she was raised by both parents and stopped school in the seventh grade to stay home and help her mother. (Id.) She was one of eleven children, and left home at the age of nineteen. (Id.) She was never married. (Id.) She was with the father of her two sons for more than five years before he died of a heart problem. (Tr. 340). Plaintiff described him as alcoholic and abusive. (Id.) She reported attending special education classes while in school. (Id.)

Dr. Bhargava diagnosed plaintiff with major depressive disorder recurrent moderately severe without psychosis, and alcohol abuse in partial remission. (Id.) She assessed a Global Assessment of Functioning ("GAF") score of 58.[13] (Id.) Dr. Bhargava recommended discontinuing Symbyax due to plaintiff's weight issues; increasing Fluoxetine; and starting Trazodone. (Tr. 340). Dr. Bhargava wrote that plaintiff may benefit from counseling to deal with her grief issues and improve her coping skills so that she did not have to self-medicate with alcohol. (Id.)

On May 28, 2008, plaintiff was seen at Advanced

---

[13]According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates only moderate symptoms. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (Text Revision, 4th ed. 2000).

Healthcare with complaints of back pain and headaches. (Tr. 360). June 18, 2008 x-rays of plaintiff's lumbar spine, and of plaintiff's thoracic spine, revealed mild degenerative arthritis and mild scoliosis (curvature of the spine). (Tr. 372-73). X-rays of plaintiff's knees performed on this date were "[e]ssentially unremarkable." (Tr. 384). On June 25, 2008, she complained that Requip was not helping at all. (Tr. 359). On July 15, 2008, she was seen for discussion of lab results. (Tr. 358).

On August 12, 2008, plaintiff was seen at Advanced Healthcare with complaints of lower back pain, and also stated that she did not get a mammogram. (Tr. 357). She was tender and had decreased range of motion over her lumbar spine. (Id.)

On September 9, 2008, plaintiff was seen at Advanced Healthcare stating that she was "trying to get her head back to normal" and for medication refills. (Tr. 356). She was tender and had decreased range of motion over her lumbar spine. (Id.)

On September 18, 2008 plaintiff was seen in the emergency room of Advanced Healthcare with complaints of pelvic pain and lumbar pain that radiated into her buttocks, and some left arm pain. (Tr. 433). Upon examination, plaintiff's vital signs were stable, her heart rate was regular and rhythmical, and her abdomen was soft and non-tender. (Id.) Electrocardiogram and serial cardiac enzymes were normal. (Id.) Dr. Rains opined that plaintiff may have an ovarian cyst, and ordered a pelvic ultrasound. (Id.) Plaintiff declined admission to the hospital. (Tr. 433).

On October 16, 2008, plaintiff underwent nerve conduction studies at Advanced Healthcare which revealed possible left ulnar neuropathy at the elbow. (Tr. 431-32). The left and right median nerve and the right ulnar nerve conduction were within normal limits, and data was not obtained for the right median sensory nerve. (Tr. 432).

On October 29, 2008, plaintiff was seen by Dr. Rains in the emergency room at Advanced Healthcare with complaints of ethanol intoxication and a purported drug overdose. (Tr. 424). Dr. Rains noted that plaintiff reported having a disagreement with her boyfriend during which he slapped an open bottle of Vicodin from her hand. (Id.) Dr. Rains noted that plaintiff reported that the boyfriend left to make a phone call and, when he returned, it was noticed that the bottle contained only 28 of 40 Vicodin tablets. (Id.) Plaintiff denied taking any Vicodin, and her drug screen was negative. (Id.)

Upon examination, Dr. Rains noted that plaintiff was alert and oriented in spite of having a high level of alcohol intoxication. (Tr. 424). Dr. Rains also noted that plaintiff's vital signs were stable, her heart rate was regular and rhythmical, her lungs were clear, and her abdomen was soft and non-tender. (Id.) Dr. Rains assessed plaintiff with alcohol intoxication, and determined that it did not appear that any suicidal ideation occurred with this incident. (Id.) Dr. Rains noted that plaintiff refused to be admitted for observation, and that she was sitting in a chair and was "quite lucid," and instructed plaintiff to follow

up on an as-needed basis. (Tr. 425).

Chest x-ray performed on November 7, 2008 at Advanced Healthcare revealed no evidence of an acute cardiopulmonary process. (Tr. 423).

On February 9, 2009, plaintiff was seen by Donald S. Piland, M.D., for a disability evaluation. (Tr. 391-400). Plaintiff reported being disabled due to a heart condition, lower abdominal pain, and a learning disability. (Tr. 391). Plaintiff reported that she had a several-year history of heart disease, and had chest pain with minimal walking or doing housework. (Id.) She described the pain as a sharp stabbing pain between her shoulder blades that lasted two to three minutes and was relieved with three Nitroglycerins, and also complained of pain radiating down her left arm and shoulder. (Id.) Dr. Piland noted that plaintiff had a negative stress test in January of 2007. (Id.) Plaintiff also complained of a significant lower abdominal pain that had been ongoing for some time. (Tr. 391). She reported a history of enrollment in special education classes, and stated that she did not understand a lot of things, and could do her shopping but had difficulty writing checks. (Id.) She used food stamps without difficulty. (Id.) She denied alcohol use. (Tr. 392). Dr. Piland noted that plaintiff was alert and cooperative and in minimal distress. (Id.) Examination of plaintiff's heart and abdomen were normal. (Tr. 393). She was able to get on and off the examination table without difficulty, and no focal, motor or sensory deficits were noted. (Id.) She could heel and toe walk and tandem toe

walk, and could squat with minimal assistance.  (Id.)  There was no
muscle tenderness or spasm.  (Id.)

Dr. Piland assessed chest pain, noting that it was most
likely that it was non-cardiac in nature, given her negative test
results.  (Tr. 393).  He assessed a "substantial" learning
disability, and low abdominal pain, which he noted plaintiff had
described as "significant." (Id.) Dr. Piland noted that plaintiff
had risk factors for coronary artery disease, a smoking history,
and a history of alcohol excess.  (Id.)

Dr. Piland concluded that plaintiff should be able to
sit, stand, walk moderate distances, lift moderately heavy objects,
carry light objects for moderate distances, handle objects, hear,
speak and travel despite her functional limitations.  (Tr. 394).
Dr. Piland found that plaintiff's learning disability would limit
her ability to work with the public or work with funds such as in
a cashier's capacity.  (Id.)

Dr. Piland opined that plaintiff could occasionally lift
and carry 25 pounds and could frequently lift/carry ten; and that
plaintiff's ability to stand and/or walk were not impaired.  (Tr.
397).  Dr. Piland indicated that plaintiff's limitations were due
to chest pain.  (Tr. 398).  Dr. Piland found that plaintiff had no
manipulative limitations.  (Tr. 399).  He found that plaintiff had
no environmental limitations other than hazards, explaining that
her learning disability could limit her understanding of
significant dangers.  (Tr. 400).

On February 20, 2009, plaintiff was admitted to Advanced

Healthcare Medical Center, and was evaluated by Dr. Rains. (Tr. 406-09). Plaintiff's chief complaint was lethargy, a nonproductive cough, chest pain, and shortness of breath. (Tr. 406). She reported having experienced chest pain that morning, along with malaise and swelling in her eyes, and thoracic and lumbar back pain. (Id.) She reported that her Nitro Patch caused a skin rash. (Id.) She reported smoking two and one-half packs of cigarettes daily, and consuming a case of beer per week. (Tr. 407). She denied a history of respiratory disease, and denied a history of abdominal pain, nausea and vomiting, or history of other gastrointestinal disease or dysfunction. (Id.) She denied diminished range of motion, bone or joint tenderness or muscle weakness. (Id.) It is indicated that she suffered from chronic anxiety, chronic depression, and insomnia. (Id.) Upon examination, Dr. Rains noted that plaintiff had a cough and poor air exchange, but clear lungs. (Tr. 408). Examination of plaintiff's heart was normal, and she had full range of motion. (Id.) Plaintiff's admission diagnoses were chest pain, rule out heart attack and pneumonia, acute bronchitis, lumbar back pain, hypertension, hypothyroidism, chronic anxiety and depression, and tobacco abuse. (Tr. 409, 413). Chest x-ray performed on this date revealed no acute infiltrates or effusions, a normal heart size, and a prominent right and left hilum. (Tr. 417).

On February 21, 2009, Dr. Rains noted that plaintiff reported feeling "considerably better now than on admission." (Tr. 412). Dr. Rains noted that plaintiff's vital signs were in the

normal range, and she had no fever. (<u>Id.</u>) Dr. Rains assessed non-cardiac chest pain that had resolved, and acute bronchitis. (<u>Id.</u>) Dr. Rains wrote: "Nursing has indicated to me that the patient has been very noncompliant regarding the hospital's nonsmoking policy. She has gone out on the parking lot to smoke and to consume alcohol. The patient wants to leave. We will discharge the patient today." (<u>Id.</u>) She was instructed to follow-up in the clinic in four days. (Tr. 412). Dr. Rains indicated that he was prescribing Levaquin. (<u>Id.</u>) Plaintiff's discharge diagnoses were chest pain, acute bronchitis, lumbar back pain, hypertension, and hypothyroidism. (Tr. 413).

On March 16, 2010, plaintiff saw Shahid K. Choudhary, M.D., having been referred by Dr. Rains, with complaints of pain in her legs, and for reported seizures. (Tr. 533, 537-38). She explained that friends had observed symptoms such as stiffening and making jerking movements. (Tr. 537). Plaintiff reported drinking a twelve-pack of beer over the weekends but not during the week, and smoking two packs of cigarettes per day. (<u>Id.</u>) She noted her past medical history included hypertension and migraine headaches, and she also had a history of back pain. (<u>Id.</u>) Examination of plaintiff's neck, heart, lungs, abdomen, and extremities were all within normal limits, and plaintiff was alert and oriented. (Tr. 538). Motor and sensory examination were normal. (<u>Id.</u>) Dr. Choudhary's assessment was possible seizures that may be due to alcohol withdrawal, since she drank over the weekends and not during the week, and her seizures occurred during the week. (<u>Id.</u>)

She was scheduled for an MRI of the brain, as well as an EEG, and told to stop drinking. (Id.)

On March 17, 2010, plaintiff saw Dr. Rains with complaints of bilateral leg pain at night. (Tr. 531). Upon examination, Dr. Rains noted that plaintiff's vital signs were stable, her lungs were clear, and her heart rate was regular and rhythmical. (Id.) Her abdomen was soft and non-tender. (Id.) She was given Requip. (Id.)

On March 30, 2010, plaintiff saw Dr. Rains with complaints of sore throat, sinus drainage, sneezing, and cough. (Tr. 528). She also complained of nocturnal leg cramps not abated by Requip. (Id.) Upon examination, Dr. Rains noted that plaintiff's vital signs were stable, her lungs were clear, and her heart rate was regular and rhythmical. (Id.) Her abdomen was soft and non-tender. (Id.) She had good range of motion in all of her extremities, and normal reflexes. (Tr. 528). Dr. Rains assessed an upper respiratory tract infection, pharyngitis, bronchitis, diastolic hypertension, and nocturnal leg cramps, and gave plaintiff cough medicine and Mirapex.[14] (Id.)

On April 6, 2010, plaintiff saw Dr. Rains with complaints of right lower abdominal pain and lumbar pain. (Tr. 525). Upon examination, Dr. Rains noted that plaintiff's vital signs were stable, her lungs were clear, and her heart rate was regular and

---

[14]Mirapex, or Pramiprexole, is used to treat the symptoms of Parkinson's Disease, including shaking of parts of the body, stiffness, slowed movements, and problems with balance. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697029.html

rhythmical. (Id.) Her abdomen was soft and non-tender, with the exception of right lower abdominal tenderness. (Id.) She was given antibiotics and instructed to follow up in nine days. (Id.)

On April 23, 2010, plaintiff saw Dr. Rains with complaints of right side abdominal pain. (Tr. 522). Upon examination, Dr. Rains noted that plaintiff's vital signs were stable, her lungs were clear, and her heart rate was regular and rhythmical. (Id.) Her abdomen was soft and non-tender. (Id.) Dr. Rains assessed right-side abdominal pain, and ordered gastro-intestinal testing, including colonoscopy. (Id.) Colonoscopy was performed on May 11, 2010, and revealed a single small non-bleeding polyp in the rectum, and a biopsy was ordered. (Tr. 534).

### III.    The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since August 6, 2006. (Tr. 18). The ALJ found that plaintiff had minimal degenerative changes of the lumbosacral and thoracic spine, left hip, and knees, and minor cardiovascular abnormalities with non-cardiac chest pain, but no impairment or combination of impairments that met or medically equaled a listed impairment. (Id.) The ALJ determined that plaintiff was unable to perform her past relevant work. (Id.) The ALJ determined that plaintiff retained the residual functional capacity to perform the physical exertional and non-exertional requirements of work except for lifting or carrying more than ten pounds frequently or more than 20 pounds occasionally; climbing or more than occasional balancing, stooping, kneeling, crouching, or

-29-

crawling; working at unprotected heights or around dangerous moving machinery; or having concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants. (Id.)  The ALJ found that plaintiff's residual functional capacity to perform the full range of light work was reduced by the findings expressed, supra.  (Tr. 18).  The ALJ found that plaintiff did not have a substance abuse disorder that was uncontrollable and that prevented the performance of substantial gainful activity.  (Tr. 19).  The ALJ concluded that plaintiff was not disabled as defined by the Act.  (Id.)

## IV.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, at the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

<u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even when two inconsistent conclusions can be drawn from the evidence, the reviewing court may still find that the Commissioner's decision is supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). A reviewing court may not reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary outcome." <u>Pierce v. Apfel</u>, 173 F.3d 704, 706 (8th Cir. 1999) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993)).

In the case at bar, plaintiff contends that the ALJ failed to properly develop the medical record. In support, plaintiff claims that the ALJ erred in failing to find her intellectual functioning deficits and depression severe, and argues that the ALJ failed to fully and fairly develop the record in this regard. Plaintiff further contends that the ALJ failed to properly weigh the medical evidence from Dr. Hoja. Plaintiff also argues that the ALJ failed to properly evaluate plaintiff's credibility, and failed to adequately consider the decision of Missouri Healthnet for the Aged, Blind and Disabled.

A.  <u>Credibility Determination</u>

Plaintiff argues that the ALJ's credibility determination is erroneous because he impermissibly relied upon on his own lay opinion when he noted that plaintiff had not been hospitalized,

seen by specialists, had no uncontrollable side effects, and lacked the "typical" signs associated with chronic pain. Suggesting that this was an impermissible medical conclusion, plaintiff states that the ALJ "based his entire credibility determination on what he perceived as self-imposed limitations by Ms. Barnes, noting that she did not have what were considered to be "typical" findings for someone with the conditions and limitations claimed." (Docket No. 12 at pages 15-16).

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged impairments. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 321-22. In Polaski, the Eighth Circuit addressed this difficulty, and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

-34-

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A)). An ALJ may not disregard subjective complaints merely because there is no evidence to support them, but may disbelieve such allegations due to "inherent inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see also Polaski, 739 F.2d at 1322 (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ cited Polaski and Social

-35-

Security Rulings 96-4p and 96-7p, which correspond with Polaski and credibility determination, and listed the Polaski factors he considered in making his decision. The ALJ then conducted an exhaustive analysis of all of the evidence of record, and discussed its impact upon plaintiff's subjective allegations of mental and physical symptoms precluding all work.

In making his decision, the ALJ wrote that plaintiff lacked "most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits (motor, sensory or reflex loss) or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, positive straight leg raising, inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction." (Tr. 16). For his challenge of the ALJ's credibility determination, plaintiff complains that, in so observing, the ALJ was impermissibly relying upon his own lay opinion, and his credibility determination is therefore erroneous. Plaintiff's argument is unavailing.

The Commissioner's Regulations provide that, in determining disability, the ALJ will consider all symptoms, including pain, "and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a) and 416.929(a). "Objective medical evidence" is defined as "medical signs and laboratory findings." Id. "Medical signs" are

-36-

anatomical, physiological, or psychological abnormalities that can be observed apart from a claimant's subjective complaints. 20 C.F.R. §§ 404.1528(b) and 416.928(b). "Laboratory findings" are anatomical, physiological, or psychological phenomena which can be shown through the use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. §§ 404.1528(c) and 416.928(c). Therefore, the ALJ was not reaching an impermissible medical conclusion when he noted the absence of any evidence of muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, positive straight leg raising, inflammatory signs, reduced joint motion, muscle spasm, sensory deficit, or motor disruption. Instead, the ALJ was following the Regulations and considering the extent to which plaintiff's symptoms, including pain, could reasonably be accepted as consistent with the objective medical evidence as required by 20 C.F.R. §§ 404.1529(a) and 416.929(a).

In addition, the extent to which plaintiff's complaints could be considered consistent with the objective medical evidence was but one factor the ALJ considered before discrediting plaintiff's complaints of pain and other symptoms precluding all work. The ALJ also considered the fact that none of plaintiff's treating or examining physicians, other than Dr. Hoja, opined that plaintiff was disabled or totally or seriously incapacitated. Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of *reliable* medical opinions

to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination). The ALJ noted that plaintiff had had no surgery or inpatient hospitalizations, at least not in recent years, and that she had not been referred for physical therapy or pain management. The ALJ noted that no doctor placed any specific long-term limitations on plaintiff's ability to stand, sit, walk, bend, lift, carry, or do other basic exertional activities beyond those the vocational expert was asked to assume during the hearing. This finding was proper. A record, such as that in the case at bar, that fails to reflect credible physician-imposed restrictions during the relevant time frame suggests that the claimant's restrictions in daily activities are self-imposed rather than restricted by medical necessity. See Eichelberger, 390 F.3d at 590; see also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day"); Fredrickson v. Barnhart, 359 F.3d 972, 977 n. 2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.")

Regarding allegations of learning disorder or borderline intellectual functioning, the ALJ noted that, while plaintiff perhaps did have some type of learning disorder while in school, any suggestion that she had "borderline intelligence" was belied by her reasonably successful work history that included semi-skilled

work, and her demonstrated abilities for self care, living independently, and managing her own household. Absent any evidence of a change in a person's intellectual functioning, her I.Q. is presumed to remain stable over time. Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006) (quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)). The fact that plaintiff worked successfully with her present level of intellectual functioning, coupled with the absence of evidence of significant deterioration in her intellectual functioning, demonstrate the impairments are not disabling in the present. Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) (citing Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992)). Furthermore, plaintiff did not state that she stopped working due to an intellectual deficit. Id. (citing Johnson, 240 F.3d at 1147) (noting the fact that the claimant did not stop working due to his disability). Finally, the ALJ noted that plaintiff's history failed to show any of the deficits in adaptive functioning that are part of true mental retardation, and further noted that, during the hearing, plaintiff did not impress him as being of unusually low intelligence. "The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations." Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001); see also Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007).

Regarding depression, the ALJ noted that there was no documented evidence that plaintiff had any significant mood disorder before or after she saw Dr. Bhargava in March of 2008.

-39-

Furthermore, the record fails to show that plaintiff regularly sought mental health treatment from a mental health specialist. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions). The record also fails to indicate that plaintiff was ever refused medical care or testing due to an inability to pay, and plaintiff testified that there was no treatment that her doctors had recommended that she had been unable to undergo due to expense, distance, or lack of insurance. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (absent evidence claimant was denied low-cost or free medical care, claimant's argument he could not afford medical care was appropriately discounted).

The ALJ also noted that Dr. Bhargava assessed plaintiff with a GAF of 58, indicating only moderate symptoms. Plaintiff did not allege depression in either of her applications, and her testimony hardly supports allegations of disabling depression. Plaintiff testified that she began experiencing depression after the deaths of two people who were close to her, and when asked to describe the scale of her depression on a scale of one to ten, with ten being the worst, plaintiff stated that "one is normal." (Tr. 57). Plaintiff testified that she was at a one "several times a week," and regarding "the other three or four times" she said she felt like she did not want to get up or do anything, but this feeling lasted "[j]ust for a couple of hours," and she took

medicine to help it.  (Id.)

The ALJ noted that plaintiff did not have significant side effects from medications and that, whatever side effects she did have, they appeared to have been remedied via changes in the dosage or type of medication.  Side effects from medication are one of the Polaski factors established by the Eighth Circuit as proper to consider in evaluating the credibility of a claimant's subjective complaints.  Polaski, 739 F.2d 1320.

The record also record indicates that plaintiff consistently smoked as much as two packs of cigarettes per day despite her complaints of chest pain and cough.  The fact that plaintiff continued to smoke cigarettes despite these symptoms, and despite her diagnosis of coronary artery disease, detracts from her credibility.  See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

The ALJ concluded that plaintiff's allegations of impairments, either singly or in combination, producing symptoms and limitations sufficiently severe to prevent the performance of all sustained work were not credible.  As explained above, review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth inconsistencies detracting from plaintiff's credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ

considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. <u>Hogan</u>, 239 F.3d at 962.

B. <u>Fully and Fairly Developed Record</u>

Plaintiff contends that the ALJ failed to properly develop the medical record. Specifically, plaintiff argues that the ALJ erred in failing to develop the record to determine the severity of her learning disorder, borderline intellectual functioning, and depression, and should have found that these were severe impairments. Plaintiff suggests that the ALJ should have requested a mental functional capacity assessment, I.Q. test, or consultative examination.

The ALJ has a duty to ensure a fully and fairly developed record even if, as in this case, the claimant is represented by counsel. <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1137 (8th Cir. 1998). The ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence from a treating or examining physician that addresses the alleged impairments at issue. <u>Nevland v. Barnhart</u>, 204 F.3d 853, 858 (8th Cir. 2000). An ALJ is required to order a consultative examination when the evidence as a whole is insufficient to support a decision on a claim. 20 C.F.R. §§ 404.1512(e), 404.1519a(b), 416.912(e), 416.919a(b); <u>see</u> <u>also</u> <u>Sultan v. Barnhart</u>, 368 F.3d 857, 863 (8th Cir. 2004). An ALJ is also required to re-contact a physician when the ALJ is unable to determine from the record whether the claimant is disabled. <u>Sultan</u>, 368 F.3d at 863. An ALJ is permitted to issue

a decision without obtaining additional medical evidence as long as other evidence in the record provides a sufficient basis for the ALJ's decision. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). The claimant bears the burden to establish that she meets the criteria for an award of benefits. Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009).

There is no "bright line test" for determining when the ALJ has failed to ensure a fully and fairly developed record, and the determination in must be made on a case-by-case basis. Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994). Reversal for failure to ensure a fully developed record is warranted only where such failure is unfair or prejudicial. Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).

The record supports the ALJ's decision that plaintiff's alleged deficits in intellectual functioning and alleged depression were not severe impairments, and the ALJ was under no duty to further develop the record on the subject. As discussed fully above, the ALJ's decision was influenced by his determination that plaintiff's allegations were not fully credible, a decision which was supported by good reasons and substantial evidence. As explained above, the undersigned defers to the ALJ's credibility determination. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (the court defers to ALJ's credibility determination when it is supported by good reasons and substantial evidence).

There record contains little evidence indicating that plaintiff suffered from a learning disability or intellectual

limitation that could properly be considered a severe impairment. As discussed in detail above, the ALJ noted that, while plaintiff may have had a learning disorder while in school, the suggestion that she has borderline intelligence was belied by her reasonably successful work history and her ability to manage her own household. Consistent with this observation, plaintiff testified that she left school in the seventh grade because she felt she could learn more at home and that, after leaving school, she started looking for work. She told Dr. Bhargava that she left school to help her mother. This testimony does not support the conclusion that plaintiff was, or felt she was, unable to learn or unable to work because of her intellectual functioning.

The ALJ noted that plaintiff's basic abilities to think, understand, communicate, concentrate, get along with others, and handle normal work stress had never been significantly impaired on any long-tem basis. The ALJ noted that there had been no documented serious deterioration in plaintiff's personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time. It was proper for the ALJ to consider this evidence in rejecting plaintiff's allegations of a disabling mental impairment. Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) (ALJ did not err in discrediting an I.Q. score of 59 when he noted that claimant had no trouble communicating, claimant passed a driver's license examination, drove a car, lived independently, and

and had never been terminated from a job due to lack of mental ability); see also Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (noting that the claimant's intelligence level did not prevent him from engaging in substantial activities of daily living, such as caring for a family, performing household chores, driving a car, visiting friends, playing games, paying bills, passing a driver's licence examination; claimant not disabled by mental impairment where he worked with "cognitive abilities he currently possessed.") In addition, plaintiff worked for years with her present level of intelligence and learning abilities, and there is no evidence in the record that she suffered any decline. As discussed above, absent any evidence of a change in a person's intellectual functioning, her I.Q. is presumed to remain stable over time. Maresh, 438 F.3d at 900 (internal citation omitted); see also Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) (claimant worked with his impairments over a period of years without any worsening of his condition, and therefore cannot claim it as disabling).

   In addition, when plaintiff was seen by Dr. Piland, he did not conduct any formal testing of plaintiff's learning ability, and it therefore appears, as the Commissioner contends, that when he included "learning disability, substantial" in his list of impressions, he did so based upon plaintiff's self-reported history, and the only limitations he attributed to this were that she should avoid excessive exposure to certain workplace hazards, which the ALJ took into account in his decision.

   There is further no error in the fact that the ALJ did not

further develop the record regarding depression or find that plaintiff's depression was severe. The ALJ noted that plaintiff had never been described as suicidal. This finding is supported by the record. When plaintiff was evaluated by Dr. Bhargava, a psychiatrist, in March of 2008, Dr. Bhargava wrote that plaintiff's "vital parameters were stable," and that her mood was depressed but her affect brightened easily, and she was not suicidal or homicidal. Dr. Bhargava also found that plaintiff's cognition was grossly intact, and that her I.Q. was probably borderline. On January 27, 2007, when plaintiff presented to the emergency room reporting suicidal thoughts after a fight with her boyfriend, plaintiff was examined and it was concluded that there was no evidence of suicidal intent. (Tr. 334). In addition, Dr. Rains determined, after evaluating plaintiff after she presented to the emergency room after a subsequent argument with her boyfriend, that she had no suicidal ideation. (Tr. 424).

As discussed in detail, infra, plaintiff did not allege depression in either of her applications, and there is little in the record indicating that plaintiff suffers from depression that could be considered severe. During her administrative hearing, she testified that she began feeling depressed after the deaths of two important people in her life, and she characterized her depression as a one on a scale of one to ten, if "10 makes you really feel low during the day and one is pretty normal." (Tr. 57). Plaintiff testified that she felt at a level one several times per week, and that, the rest of the time, she felt like she did not want to get

up or do anything, but that this feeling lasted "[j]ust for a couple of hours." (Id.)  This, combined with the fact that plaintiff did not allege depression as a basis for disability in either of her applications, further supports the conclusion that the ALJ's decision is supported by substantial evidence even though he did not order a psychiatric consultative evaluation.  See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) (the mere fact that the claimant had been prescribed antidepressants at least once is not enough to require the ALJ to inquire further into the condition by ordering a consultative evaluation).

In this case, the ALJ fully analyzed the administrative record before him, conducted an exhaustive analysis of the medical evidence of record, and concluded that plaintiff's alleged impairments did not preclude all work.  An ALJ is permitted to issue a decision without obtaining additional medical evidence as long as other evidence in the record provides a sufficient basis for the ALJ's decision.  Anderson, 51 F.3d at 779.  There is no indication that the ALJ felt unable to make the assessment he did, and the undersigned concludes that sufficient evidence existed for the ALJ to make a fully informed decision as to plaintiff's alleged impairments, and he was under no duty to further develop the record. Tellez, 403 F.3d 953, 956-57 (8th Cir. 2005) (the record contained sufficient evidence from which to make an informed decision).

C.    Medical Opinion Evidence

Plaintiff also contends that the ALJ failed to properly weigh the medical evidence from Dr. Hoja.    The undersigned

disagrees.

The Commissioner's Regulations provide that an ALJ will give a treating physician's opinion on the issue(s) of the nature and severity of an impairment or impairments controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); see also Hogan, 239 F.3d at 961.

Citing 20 C.F.R. §§ 404.1527(d) and 416.927(d), the ALJ acknowledged the standard for evaluating evidence from a treating source, and fully explained his reasons for denying treating-source weight to Dr. Hoja's opinion. (Tr. 15). Plaintiff states that Dr. Hoja's opinion was made after "extensive work-up" and was not contradicted by other substantial evidence in the record, and his opinion therefore should be given controlling weight. (Docket No. 12 at page 12). However, plaintiff is not specific regarding what other substantial evidence was consistent with Dr. Hoja's opinion, and the undersigned notes that no physician in the record indicated that plaintiff was as limited as indicated by Dr. Hoja.

Dr. Hoja articulated no evidence-based rationale for his opinions that plaintiff was disabled and unable to work. Although Dr. Dr. Hoja endorsed plaintiff's application for public assistance based on lumbar disc disease, depression, coronary artery disease, hypertension, and hypothyroidism, he did not explain how he reached his conclusions, what medical data supported them, or how plaintiff's impairments restricted her ability to perform work-

related functions. The ALJ noted that, although Dr. Hoja opined that plaintiff had diagnoses of hypertension and chronic obstructive pulmonary disease, the medical evidence demonstrated that these conditions were controllable with medical treatment. The ALJ noted that, while plaintiff reported that she did not try to resume working because Dr. Hoja had told her not to and opined that she was totally disabled, Dr. Hoja's opinion was very outdated since at least 2007, when various diagnostic tests began to show the absence of severe underlying heart disease. The ALJ also noted that, although Dr. Hoja in 2006 expressed grave concern about plaintiff's cardiac condition, subsequent medical testing repeatedly revealed that she did not have severe underlying heart disease, and plaintiff's other physicians opined that her chest pain was non-cardiac in nature. While a treating physician's opinion is usually entitled to substantial weight, it must be supported by medically acceptable clinical or diagnostic data. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998). An ALJ may discount or even wholly reject a treating physician's opinion that is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record. Hogan, 239 F.3d at 961.

In addition, Dr. Hoja was a specialist in the field of obstetrics and gynecology. He was not a pain specialist, cardiologist, orthopedist, or neurologist. Despite plaintiff's contentions, the ALJ was entitled to consider that Dr. Hoja was

offering opinions about medical conditions outside his area of specialty. "Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist." Brown v. Astrue, 611 F.3d 941, 954 (8th Cir. 2010) (internal citation omitted).

The ALJ also properly considered the fact that, of all the doctors who treated or examined plaintiff, only Dr. Hoja opined that plaintiff was disabled. An ALJ may discount, or even completely reject, the opinion of a treating physician if it is inconsistent with the record as a whole. McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008)).

Finally, Dr. Hoja's opinion that plaintiff is disabled and unable to perform any work is not a medical opinion of what plaintiff's actual limitations and abilities are; it is his opinion whether plaintiff is capable of working. This is a decision reserved for the Commissioner. House v. Astrue, 500 f3d 741, 745 (8th Cir. 2007) (citing Kroqmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.")) Such statements simply "are not conclusive as to the ultimate question" of disability. Nelson v. Sullivan, 946 F.2d 1314, 1316-17 (8th Cir. 1991).

Plaintiff correctly states that a treating physician's opinion should never be ignored. However, it is very clear from the

ALJ's decision that he did not ignore Dr. Hoja's opinion.  Instead, the ALJ acknowledged Dr. Hoja's status, cited the Regulations mandating the treatment to be afforded evidence from treating sources, and fully explained his reasons for declining to give Dr. Hoja's opinion controlling weight.  The undersigned therefore concludes that substantial evidence supports the ALJ's decision to decline to give controlling weight to Dr. Hoja's opinion.

       D.    <u>The Missouri Healthnet Decision</u>

       Plaintiff finally contends that the ALJ failed to adequately consider the Missouri Healthnet decision, which found plaintiff disabled for purposes of qualifying for public assistance in the state of Missouri.  Plaintiff suggests that the Missouri decision was entitled to some weight, and the ALJ improperly relied upon his personal knowledge outside the record when he noted that Missouri was known to be lenient.

       In his decision, the ALJ fully discussed his rationale for not conforming his decision to that made by the State of Missouri in determining that plaintiff qualified for public assistance under Missouri State rules and regulations.  (Tr. 14-15).  The ALJ observed that the findings made by the State of Missouri "are not entitled to great weight in this proceeding despite the similar wording of the Missouri standard with the Social Security Act's definition of disability."  (Tr. 14).  The ALJ also wrote that Missouri's procedure was commonly known to be lenient, noting that medical reports are often based on the claimant's subjective allegations or outdated medical records, and that Missouri law

-51-

requires only that the period of unemployability last for 90 days or longer. (Id.) The ALJ wrote that the Social Security Administration operated under separate and distinct laws, regulations and policies, and that he would evaluate plaintiff's case based thereon. (Tr. 14-15).

As properly noted by the ALJ, a determination made by any non-governmental or any other governmental agency that a claimant is disabled is based on its own rules, and is not binding on the Commissioner. 20 C.F.R. §§ 404.1504 and 416.904; Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (a claimant's designation as disabled under state law is not binding on the Commissioner); see also Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996) (disability determination by the Veteran's Administration is not binding on an ALJ). While plaintiff makes much of the fact that the ALJ described Missouri's procedure as lenient, the undersigned notes that the ALJ did not base his conclusion on this observation, and instead considered the evidence and provided good reasons for declining to give it great weight. The ALJ noted that the state's decision tracked Dr. Hoja's assessment (which the ALJ properly found was not entitled to controlling weight) and a finding of borderline I.Q., which the ALJ had properly rejected. Because the ALJ considered the evidence, discussed its applicability to the case at bar and the weight to which it was entitled, and gave good reasons for not weighing it heavily, the undersigned cannot say, as plaintiff suggests, that the ALJ failed to adequately consider the Missouri State decision.

For all of the foregoing reasons, the undersigned finds that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F.2d at 821. Therefore, on the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the Commissioner's decision be affirmed, and Plaintiff's Complaint be dismissed with prejudice.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of September, 2011.